**McCARTIN McAULIFFE MECHANICAL CONTRACTOR, INC., Appellant–Plaintiff,**

v.

**MIDWEST GAS STORAGE, INC., an Indiana corporation, Enron Finance Corp., a Delaware corporation and Terrence O'Malley, Appellees–Defendants.**

No. 11A01–9608–CV–274.

Court of Appeals of Indiana.

Sept. 18, 1997.

Rehearing Denied Nov. 24, 1997.

Terrence L. Brookie, Robert W. Wright, Nelson D. Alexander, Locke Reynolds Boyd & Weisell, Indianapolis, for Appellant–Plaintiff.

Gary G. Hanner, Sam A. Swaim, Hanner Hanner & Hanner, Rockville, for Appellees–Defendants.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE [1]

McCartin McAuliffe Mechanical Contractor, Inc. ("McCartin") appeals from the trial court's partial summary judgment in favor of Midwest Gas Storage, Inc. ("Midwest") and against McCartin. Midwest is a public utility engaged in the business of natural gas storage. McCartin had entered into a contract with Midwest for the construction of a natural gas pipeline in Clay and Parke counties. McCartin filed two sets of mechanic's liens against Midwest's various property interests associated with the pipeline and operation of the Carbon–Calcutta underground natural gas storage field. The liens were filed with the Clay and Parke County recorders for work performed on the pipeline and related facilities. McCartin subsequently filed suit against Midwest seeking to foreclose on its mechanic's liens.[2] The trial court granted Midwest's motion for summary judgment on Counts I and V, the mechanic's lien foreclosure counts. McCartin now appeals.[3]

We reverse and remand.

**1.** Oral argument was held on July 1, 1997.

**2.** We note that McCartin also named Terrence O'Malley, President of Midwest, and Enron Finance Corporation as defendants. McCartin filed suit alleging a personal guarantee against O'Malley and Enron Finance Corporation was named a nominal defendant because McCartin believed Enron might claim to have some interest in Midwest's property by virtue of a Mortgage, Security Agreement, and Assignment of Leases and Rents. These parties are not relevant to the disposition of Counts I and V and, thus, they are not discussed in this opinion.

**3.** The trial court granted summary judgment in favor of Midwest on November 6, 1995. On January 29, 1996, all pending issues were ordered to be resolved through arbitration. The

## ISSUES

McCartin presents several issues for our review:

1. Whether Indiana's mechanic's lien laws are preempted by the Natural Gas Act, 15 U.S.C. § 717.

2. Whether the public use and necessity exception applies to Midwest, a quasi public corporation.

3. Whether McCartin complied with the mechanic's lien statute.

## FACTS

The facts most favorable to McCartin show that McCartin is a mechanical contractor that performs piping installation for the steel, power, chemical and pipeline industries. Midwest is a privately owned public utility which operates under a certificate of public convenience and necessity issued by the Federal Energy Regulatory Commission ("FERC"). Midwest is subject to FERC's jurisdiction and must comply with the provisions of the Natural Gas Act ("NGA").[4] FERC issued a certificate to Midwest on April 30, 1991, which imposes various requirements upon Midwest and authorizes Midwest to operate the Carbon–Calcutta natural gas storage field, a porous underground natural limestone cavern located in Clay and Parke counties. Midwest's pipeline is connected to a pipeline owned and operated by Panhandle Eastern Pipeline Company ("Pan-

three member arbitration panel found in favor of McCartin and against Midwest and O'Malley. The panel awarded McCartin a total of $1,854,-799.00 in damages for "Job No. 3157 and Job No. 3255." The panel also found that Midwest had not violated Indiana Code § 35–43–4–3 (criminal conversion) and, therefore, that McCartin was not entitled to damages, costs or attorney fees pursuant to Indiana Code § 34–4–30–1 (offenses against property).

**4.** McCartin argues in its brief that the Natural Gas Policy Act of 1978, 15 U.S.C. §§ 3301–3432, excludes Midwest from the provisions of the NGA. However, the affidavit of Terrence O'Malley and the certificate of public convenience and necessity designated by Midwest demonstrate that Midwest is subject to the jurisdiction of FERC under the NGA.

handle Eastern") which owns and operates thousands of miles of natural gas pipeline in the United States. Part of Panhandle Eastern's system runs near Bellmore, Indiana, in Parke County. Midwest's twelve-inch pipeline connects with Panhandle Eastern's twenty-six inch pipeline approximately one mile north of Bellmore. This point is commonly referred to as the "Bellmore interconnect." Panhandle Eastern, among other companies, deposits natural gas into the Carbon–Calcutta storage field during periods of low demand, typically in the summer and autumn, and withdraws natural gas from the field during periods of high demand, generally in the winter.

On September 4, 1992, McCartin entered into a contract with Midwest to construct fourteen miles of a twelve-inch pipeline to be installed in the Indiana Department of Transportation's highway right-of-way as well as on private property through easements obtained by Midwest. McCartin began work on the project in June of 1993 and, pursuant to the contract, was to be paid $2,315,052.00. To operate properly, the pipeline required the fabrication and installation of a header, which is part of the gathering system. A metering system and compressor station were also needed.[5] The parties agreed that McCartin would perform this work and be paid on a time and materials basis. After Midwest did not pay McCartin in a timely manner, McCartin stopped work on the project in March of 1994.

McCartin then filed mechanic's liens in Clay and Parke Counties for work and labor done and materials and machinery furnished in construction of the pipeline and related facilities. The claims were recorded against Midwest's property, including land, leases, easements and related interests, and the permit issued to Midwest by the Indiana Department of Transportation.[6] The amount of each lien was $1,700,000.00. The liens sought recovery for labor and materials furnished for construction of the twelve-inch pipeline, the gathering system and the compressor station. Additional liens were later filed in both counties, each for $56,783.55.

## DISCUSSION AND DECISION

### Standard of Review

Summary judgment is appropriate only if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Ind.Trial Rule 56(C). Upon review of the trial court's ruling on a motion for summary judgment, we apply the same standard as the trial court. *Henshilwood v. Hendricks County*, 653 N.E.2d 1062, 1065 (Ind.Ct.App.1995), *trans. denied.* We resolve any doubt as to a fact, or an inference to be drawn therefrom, in favor of the party opposing the motion. *Id.* When considering a motion for summary judgment, we may consider only the evidence specifically designated by the parties. *Midwest Commerce Banking Co. v. Livings*, 608 N.E.2d 1010, 1012 (Ind.Ct.App.1993).

The trial court was not required to disclose and did not disclose its reasons for granting summary judgment on the foreclosure counts. On appeal, the parties dispute various issues as grounds for and against summary judgment. We shall consider each in turn.

### Issue One: Preemption

■ McCartin contends that Indiana's mechanic's lien statutes are not preempted by the NGA. Specifically, McCartin argues that is has filed valid mechanic's liens against Midwest and that the NGA does not prohibit the enforcement and foreclosure of those liens.

Article VI of the Constitution of the United States provides that the laws of the United States "shall be the supreme Law of the

---

5. The pipeline itself will not extract or inject natural gas into or from the natural gas field without the involvement of additional components including a compressor and piping and gathering system. The gathering system includes the piping to and from the wells and well heads to the headers. The headers connect directly to the compressor station. The headers connect the gathering system, including the compressor station and metering system, to the natural gas pipeline constructed by McCartin.

6. We are not asked to decide whether a lien can be placed on an INDOT permit.

Land; ... any Thing in the Constitutions or Laws of any state to the Contrary notwithstanding." Art. VI, cl. 2; *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407, 422 (1992). Consideration of issues arising under the Supremacy Clause "start[s] with the assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447, 1459 (1947). Accordingly, the purpose of Congress is the ultimate touchstone of preemption analysis. *Cipollone*, 505 U.S. at 516, 112 S.Ct. at 2617, 120 L.Ed.2d at 422.

Congress' intent to preempt state law may be "express," i.e., explicitly stated in the statute's language, or "implied," i.e., implicitly contained in the statute's structure and purpose. *Wilson v. Pleasant*, 660 N.E.2d 327, 329 (Ind.1995) (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604, 614 (1977)). In addition, a federal statute will override a state law either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively, or when state law is in actual conflict with federal law. *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287, 115 S.Ct. 1483, 1487, 131 L.Ed.2d 385, 392 (1995).

The fundamental purpose of the NGA is to assure an adequate and reliable supply of gas at reasonable prices. *California v. Southland Royalty Co.*, 436 U.S. 519, 523, 98 S.Ct. 1955, 1957, 56 L.Ed.2d 505, 510 (1978). To this end, not only must those who would serve the interstate market obtain a certificate of public convenience and necessity but also, under § 717f(b) of the Act:

> No natural gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the [FERC], or any service rendered by means of such facilities, without the permission and approval of the [FERC] first had and obtained, after due hearing, and a finding by the [FERC] that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience and necessity permit such abandonment.

15 U.S.C. § 717f(b). Accordingly, the seller and purchaser of a gas facility must comply with the federal regulations governing the abandonment and acquisition of a gas storage field. 18 C.F.R. §§ 157.15, 157.18 (1996);[7] *see, e.g., Williams Gas Processing Co. v. Federal Energy Regulatory Comm'n*, 17 F.3d 1320 (10th Cir.1994) (approving petition for abandonment and transfer of facilities); *Viking Gas Transmission Co. and Midwestern Gas Transmission Co. v. Federal Energy Regulatory Comm'n*, 47 F.E.R.C. P61,017 (1989) (requiring approval for abandonment and acquisition of facilities). These requirements must be fulfilled to "advise the [FERC] fully concerning the operation, sales, service, construction, extension, or acquisition for which a certificate is requested or the abandonment for which permission and approval is requested." 18 C.F.R. § 157.5(a) (1996). Thus, FERC may control both the terms under which service is provided to the interstate market and the conditions under which it will cease. *Southland Royalty*, 436 U.S. at 523, 98 S.Ct. at 1957, 56 L.Ed.2d at 510.[8]

---

**7.** The regulations mandate purchasers of a storage facility to complete an acquisition application. 18 C.F.R. § 157.15 (1996). The seller must also complete an "Application[] to abandon facilities or service." 18 C.F.R. § 157.18 (1996). Among other things, the application for abandonment requires the seller to provide a statement detailing the reasons for the abandonment, exhibits including docket numbers of the prior proceedings in which the facilities sought to be abandoned were certificated, docket numbers of related pending applications, contracts or agreements which influenced the applicant to seek the abandonment, and a flow diagram of the design of the operations after the abandonment.

18 C.F.R. § 157.18(a)–(c). The seller must also provide an exhibit which outlines the impact the abandonment will have on customers, the effect of the abandonment on existing tariffs, and an accounting treatment of the abandonment. 18 C.F.R. § 157.18(d)–(f).

**8.** The Federal Energy Regulatory Commission is responsible for overseeing the operations of key parts of America's energy industries. The Commission seeks to ensure that consumers receive adequate, reliable supplies of energy at the lowest possible price, and to provide energy suppliers and transporters a just and reasonable return

Indiana law provides for the enforcement of mechanic's liens by sale. IND.CODE § 32–8–3–6. McCartin seeks to foreclose on its liens and argues that foreclosure is not preempted by the NGA because there is no relevant difference between a sale pursuant to foreclosure and a voluntary sale. The forced sale through a state foreclosure proceeding and the voluntary sale of a natural gas facility are similar except for the voluntariness of the actors. However, we do not consider that difference to be dispositive.

■ Midwest correctly points out that when a state regulation "affects the ability of FERC to regulate comprehensively . . . the transportation and sale of natural gas," or presents the "prospect of interference with the federal regulatory power," then the state law may be preempted even though "collision between the state and federal regulation may not be an inevitable consequence." *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310, 108 S.Ct. 1145, 1156, 99 L.Ed.2d 316, 331 (1988). Here, however, the foreclosure sale of Midwest's property does not affect FERC's ability to regulate comprehensively nor does it interfere with its regulatory power. The Code of Federal Regulations outlines the procedure to be followed when application is made to transfer control of a natural gas storage facility and a certificate of public convenience and necessity is issued to a new owner. *See* 18 C.F.R. §§ 157.6, 157.15 (1996). A mechanic's lien creditor who seeks to foreclose on facilities licensed by FERC would have to comply with these regulations to secure FERC's approval of the application. This process will not leave consumers without an adequate supply of gas at a reasonable rate because FERC will not permit the abandonment of the facility until a qualified purchaser has been located. *See* Natural Gas Act, 15 U.S.C. § 717f(b) (abandonment approved only when [FERC] finds the available supply of natural gas is depleted to extent that continuance is unwar-

ranted or that present or future public convenience or necessity permit such abandonment). Thus, the mere fact that the sale would be involuntary does not circumvent or frustrate Congress' intent in enacting the NGA, which is to protect consumers against exploitation at the hands of natural gas companies by assuring an adequate and reliable supply of gas at reasonable prices. *See Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 610, 64 S.Ct. 281, 291, 88 L.Ed. 333, 349 (1944) (purpose of natural gas act to protect consumers from exploitation at hands of natural gas companies). A mechanic's lien against a quasi public corporation [9] is atypical, but the trial court has the discretion to fashion an equitable decree which would allow the foreclosure of the property subject to approval by FERC.

In an ordinary foreclosure, the foreclosure sale can and often does occur without the debtor's active participation. However, the foreclosure sale and transfer of federally regulated facilities would require some degree of cooperation from the mechanic's lien debtor and, therefore, might be complicated or frustrated by an uncooperative debtor.[10] In that case, the trial court would have jurisdiction to compel the debtor's specific performance and could order the debtor to deliver such documents and to perform such acts as may be required to accomplish the sale and transfer. The court would also have authority to appoint another person to perform those tasks if the debtor were recalcitrant. *See* Ind.Trial Rule 70. While federal regulations may complicate the foreclosure proceedings, the mechanic's lien foreclosure would not conflict with the regulations. Accordingly, we hold that Indiana's mechanic's lien laws are not preempted by the NGA.

### Issue Two: Public Use and Necessity

■ Next, McCartin argues that the public use and necessity exception does not apply because Midwest's property is not "public

---

on capital investment and the opportunity to adjust to the rapidly changing market conditions. <http://www.etde.org/html/budget/ferc.html>.

**9.** A quasi public corporation is defined as a corporation that is not strictly public, in the sense of being organized for governmental purposes, but

whose operations contribute to the comfort, convenience, or welfare of the general public, such as telegraph and telephone companies, gas, water, and electric light companies, and irrigation companies. BLACK'S LAW DICTIONARY 342 (6th ed.1990).

**10.** *See supra* footnote 7.

property." Midwest counters that Indiana law does not permit mechanic's liens on property serving an essential public use or purpose.

◼ The mechanic's lien statute provides in part:

Any person who wishes to acquire a lien upon any property, whether the claim is due or not, shall file in the recorder's office of the county at any time within sixty (60) days after performing labor or furnishing material or machinery described in section 1 of this chapter, a sworn statement in duplicate of the person's intention to hold a lien upon the property for the amount of the claim. The statement must specifically set forth:

(1) the amount claimed;

(2) the name and address of the claimant and the name of the owner;

(3) the latest address of the owner as shown on the property tax records of the county; and

(4) the legal description, street and number, if any of the lot or land on which the house, mill, manufactory or other buildings, bridge, reservoir, system of waterworks or other structure may stand or be connected with or to which it may be removed.

IND.CODE § 32–8–3–3(a). This statute permits a laborer to file mechanic's liens against most properties. However, public policy and necessity prohibit the acquisition and enforcement of mechanic's liens against public property held for public use. *Board of Comm'rs of Parke County v. O'Conner*, 86 Ind. 531, 538 (1882); *see, e.g., Falout v. Board of School Comm'rs of Indianapolis*, 102 Ind. 223, 1 N.E. 389 (1885) (invalidating mechanic's lien filed against public schoolhouse); *Repp and Mundt, Inc. v. Hitzelberger Supply Co.*, 170 Ind.App. 539, 353 N.E.2d 547 (1976) (invalidating mechanic's lien filed against university apartment buildings). Here, we are asked to consider whether this exception should be applied to a privately-owned public utility.

◼ In Indiana, the public use and necessity exception has been narrowly confined to cases that involve public property [or property held for a public use.]. However, the rationale behind the exception suggests that the exception could also include property held by a quasi public corporation which serves an essential public use or purpose. In *Parke County,* our supreme court reasoned:

[T]hat it could not be supposed that the Legislature could have intended, in any case, to subject a county to the privation or loss of its buildings, such as court-house, public offices or jail, so *indispensably necessary for the public benefit and accommodation,* as also for the preservation of the public records, containing the only evidence that thousands may have for their rights, and in which, it may be truly said, that *every individual of the community has a deep interest.*

*Parke County,* 86 Ind. at 536 (citations omitted) (emphasis added).

Although a gas company is a necessary public utility,[11] we are not persuaded that Midwest's ownership of that public utility is "indispensably necessary" for the public benefit. As stated in *Issue One,* Midwest cannot abandon the facility without FERC's permission. That approval will occur only when a qualified purchaser has been approved, at which time the facility can be transferred to the new owner. Accordingly, consumers will continue to have an uninterrupted supply of natural gas at reasonable rates and will not be left without natural gas service simply because Midwest no longer owns the facility. While an adequate, reliable and reasonably priced supply of natural gas is essential to the public, Midwest's ownership of this particular facility is not. Thus, we hold that the public use and necessity exception does not apply.

### Issue Three: Compliance with Mechanic's Lien Laws

McCartin also argues that it complied with the mechanic's lien laws. Midwest asserts that the liens were not filed in a timely

---

11. The Indiana Department of Revenue has determined that Midwest is a public utility (pipeline company) under Indiana Code § 6–1.1–8–2(6).

manner, that McCartin's liens were invalid, and that McCartin waived its right to file mechanic's liens. We shall address each issue.

## A. Timeliness of Filing

■ McCartin contends that a genuine issue of material fact exists as to whether it filed the mechanic's liens in a timely manner. We agree.

Indiana Code § 32–8–3–3 provides in part that a laborer:

[S]hall file in the recorder's office of the county at any time within sixty (60) days after performing labor or furnishing materials or machinery described in section 1 of this chapter, a sworn statement in duplicate of the person's intention to hold a lien upon the property for the amount of the claim....

Midwest argues that McCartin's liens were untimely because (1) they involve work performed more than 60 days prior to the recordation of the lien and any work performed within 60 days was not authorized and did not relate to Clay County; and (2) the liens seek to include work done pursuant to one contract to revive the timeliness of the liens filed for work allegedly performed on another contract.

### 1. Timeliness of Filing and Work Authorization

McCartin's liens were filed on March 1, 1994, and April 4, 1994. Midwest asserts that these liens cover work performed more than 60 days prior to recording of the lien and that any work done within the 60–day period was unauthorized. The designated evidence indicates that in February of 1994, McCartin was working on installation of the rectifier bed in Parke County and this work was approved by Midwest. The evidence also indicates that Midwest's employees observed McCartin employees performing work

on the installation of the rectifier bed. However, Midwest claims that it did not approve the work on the rectifier bed. All designated evidence must be construed in a light most favorable to McCartin, the non-moving party. Accordingly, we conclude that there exists a genuine issue of material fact as to whether Midwest approved McCartin's work on the rectifier bed and, thus, whether McCartin timely filed the liens. Summary judgment on this issue is inappropriate.

### 2. Revival of Original Contract

McCartin next asserts that the work for Midwest was done under one contract. Midwest argues that the parties had separate contracts for the pipeline and for the header and gathering system and that the work on the later contract cannot revive the lien period for work performed on the earlier contract. Again, the designated evidence presents a genuine issue of material fact as to whether the work was performed pursuant to one or two separate contracts.[12] McCartin testified that he was aware of only one contract. The McCartin Controller also testified that the work which was performed on a time and materials basis was not a different contract, but was a different portion of the original contract. Additionally, both parties agree that the pipeline could not operate properly without the headers and gathering system. Taking all facts most favorable to McCartin, the non-moving party, we must conclude that there is a genuine issue of material fact as to whether there was one or two contracts and, thus, whether the liens were timely filed.

## B. Validity of the Mechanic's Liens

McCartin contends that its liens are not invalid while Midwest maintains that the liens include work that was never performed and that McCartin failed to pay the Clay and Parke County Recorders fees associated with "margining." [13]

12. Midwest argues in its brief that some of McCartin's employees stated that there was only one contract and some testified that there were two contracts. Midwest further asserts that "McCartin should not be able to select whom of its own employees it wishes to believe." Midwest's argument misses the point—it's not a matter of whom McCartin believes. It is a matter of

determining for summary judgment purposes whether the designated evidence creates a genuine issue of material fact. Here, there is such a factual dispute.

13. Midwest also argues that McCartin committed fraud when it filed duplicate claims in Clay and Parke Counties. However, we find no merit to

### 1. Performance of Work

■ Midwest asserts that the liens improperly included work performed on the "compressor station" and argues that work was not performed on that building. Terrence O'Malley testified that the compressor station was built after McCartin ceased working for Midwest, that the station is a separate building located several hundred feet from the pipeline and that it was not constructed or improved by McCartin. However, McCartin designates evidence which indicates that it fabricated numerous component parts which have been incorporated into the compressor station. Thus, a genuine issue of material fact exists regarding whether the compressor station is properly included in the lien.

### 2. Payment to County Recorder

Midwest contends that McCartin failed to perfect its liens. Specifically, Midwest argues that McCartin did not pay the Clay and Parke county recorders the $1.00 dollar fee required to cross reference [14] each oil and gas lease or easement involved and that, as a result, the liens do not provide notice to third parties as intended by the mechanics lien statutes. We cannot agree.

■ It is well settled that a notice of intention to hold a mechanic's lien, in substantial conformity with the statute, is sufficient, and that errors in respect to matters not required to be included in the notice will not invalidate it or defeat the lien. *Cline v. Indianapolis Mortar & Fuel Co.*, 65 Ind.App. 383, 388, 117 N.E. 509, 510 (1917). This is especially true as affecting the rights of the original parties to the contract. *Id.* A mechanic's lien notice is sufficient if it states the amount due, to whom, from whom, and for what and sufficiently describes the premises. *Jeffersonville Water–Supply Co. v. Ritter*, 146 Ind. 521, 45 N.E. 697 (1897). A lien will not be defeated by a trivial error or omission in the notice where the defect is not misleading. *Cline*, 65 Ind.App. at 388, 117 N.E. at

510; *see also Adams v. Buhler*, 131 Ind. 66, 30 N.E. 883 (1892) (to enforce mechanic's lien, it is sufficient to show that it was filed in recorder's office, and the fact that it was not recorded will not defeat enforcement). Here, Midwest does not allege that it was not given notice of McCartin's intention to hold the liens or that it was misled by McCartin's failure to see that the liens were cross-referenced on each of the other recorded documents. *See* I.C. 32–8–3–3 (recorder required to mail notice to owner). Midwest cannot defeat the validity of the liens by claiming that hypothetical third parties were not given sufficient notice of the liens claimed. Thus, insofar as Midwest is concerned, the failure to margin the notices does not invalidate the liens.

### C. Waiver

Finally, McCartin and Midwest disagree about whether McCartin has waived its right to record a mechanic's lien on work related to the storage field.

■ A "Conditional Waiver of Lien" had been executed by the parties on December 13, 1993. The waiver states in part:

> Now, therefore know ye, that subject to the receipt of the sum of *Nine Thousand Two Hundred Sixty Six Dollars and Forty Cents ($9,266.40)* the undersigned does hereby waive and release any and all lien, and claim or right to lien on said storage field and premises under the statutes of the State of Illinois [sic] relating to mechanic's liens, on account of labor and materials, or both, furnished by the undersigned to or on account of said Midwest Gas Storage, Inc. for said storage field.

(emphasis in original). Mechanic's liens can be waived but the waiver should be supported by consideration in order to be effective. *Ramsey v. Peoples Trust & Savings Bank*, 148 Ind.App. 167, 264 N.E.2d 111, 115 (1970). A waiver of mechanic's lien agreement is basically a contract between two parties in which one party promises not to

---

McCartin's claim because Midwest never claimed more than a 1.7 million dollar lien.

**14.** A county recorder is responsible for recording the notice of intention to hold a lien and is

further charged with taxing and collecting all filing fees, including the fee of "one dollar ($1) for each cross reference of a recorded document." IND.CODE §§ 32–8–3–5, 36–2–7–10(b)(4).

file a lien against the property of another. 56 C.J.S. *Mechanic's Liens* § 254 at 291 (1992).

Here, Midwest agreed to pay $9,266.40 in consideration for McCartin's waiver of mechanic's liens on all work performed prior to December 13, 1993. However, this sum was not paid either at or near the time when the waiver was executed. Rather, the evidence indicates that Midwest wrote a check to McCartin for $9,266.40 on August 2, 1994, almost eight months after the waiver was executed and some four months after the mechanic's liens had been filed. McCartin did not negotiate the check. Consideration is an essential element of every contract, and there is a failure of consideration when a party to a contract fails to perform those acts promised. *Alber v. Standard Heating and Air Conditioning,* 476 N.E.2d 507, 510 (Ind.Ct.App.1985). When the time for performance is not specified, a contract must be performed within a reasonable time. *See Lightle v. Harcourt Manage. Co.,* 634 N.E.2d 858, 862 (Ind.Ct.App.1994), *trans. denied.* Whether Midwest's failure to tender payment until many months after the waiver was executed and the mechanic's liens had been filed was unreasonable under the circumstances is a question of fact. *See Hamlin v. Steward,* 622 N.E.2d 535, 540 (Ind.Ct.App.1993) (we do not decide questions of fact on appeal). Thus, the question whether the tendered payment was so untimely as to constitute a failure of consideration and to invalidate the lien waiver precludes summary judgment.

### CONCLUSION

We conclude that federal law does not preempt Indiana's mechanic's lien laws and prohibit the filing and enforcement of a mechanic's lien on Midwest's property. Midwest has also failed to show that its ownership and interest in the gas pipeline and related facilities are indispensable such that the public use and necessity exception should apply to prevent the foreclosure of a mechanic's lien. Finally, there are genuine issues of material fact concerning McCartin's compliance with the mechanic's lien laws which preclude a summary judgment in Midwest's

favor. Accordingly, we reverse the trial court's grant of summary judgment in favor of Midwest as to Counts I and V of McCartin's amended complaint.

Reversed and remanded.

BAKER and STATON, JJ., concur.